IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JACKQUELIN LYNN SOAPER,<br>　　　　Plaintiff,<br>v.<br><br>COMMISSIONER, SOCIAL<br>SECURITY ADMINISTRATION,<br>　　　　Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>Civil Action No. 3:21-CV-1681-M-BH<br><br><br><br>Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Jackquelin Lynn Soaper (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (*See* doc. 1.). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

## I.　BACKGROUND

On July 26, 2019, Plaintiff filed her application for SSI, alleging disability beginning July 3, 2019. (doc. 19-1 at 187.)[2] Her claim was denied initially on September 20, 2019 (*id.* at 81-87), and upon reconsideration on January 28, 2020 (*id.* at 89-96). On March 6, 2020, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 106.) She appeared and testified at a hearing on January 4, 2021, which was conducted by telephone due to the "extraordinary circumstances" presented by the pandemic. (*Id.* at 32, 48, 51.) On January 26, 2021, the ALJ issued a decision finding that she was not disabled. (*Id.* at 32-43.)

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on March 12, 2021. (*Id.* at 15-16.) The Appeals Council denied her request for review on May 18, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

### A. Age, Education, and Work Experience

Plaintiff was born on November 26, 1970; she was 48 years old at the time of the hearing. (doc. 19-1 at 48, 88.) She completed the eighth grade and was able to communicate in English. (*Id.* at 42, 48-80, 205.) She had past relevant work as a hospital cleaner and laundry laborer. (*Id.* at 53, 76.)

### B. Medical, Psychological and Psychiatric Evidence

On September 22, 2017, Plaintiff underwent a unilateral knee replacement due to osteoarthritis of the right knee at Hunt Regional Medical Center. (*Id.* at 265.)

On September 20, 2019, State Agency Medical Consultant (SAMC) Scott Spoor, M.D., and State Agency Psychological Consultant (SAPC) Jean Germain, Ph.D., examined Plaintiff's medical records. (*Id.* at 81-87.) They considered her recent examinations from an emergency room visit as well as her depression, complex regional pain syndrome, and sleeping problems; they also noted that an adult function report (Form 3373) had not been returned as requested. (*Id.*) Both consultants noted that the lack of a Residual Functional Capacity (RFC) Assessment, and they concluded that there was insufficient evidence to evaluate her claims. (*Id.*)

On January 22, 2020, SAMC Robin Rosenstock, M.D., and SAPC W. Miller Logan, M.D., also reviewed Plaintiff's medical records, noted the lack of an RFC assessment, and reached the same conclusion about the insufficiency of the evidence. (*Id.* at 89-96.) They specifically noted that there was no indication that there was a medical opinion from any medical source, and that

"in spite of extraordinary efforts", they were unable to reach Plaintiff. (*Id.*)

On March 8, 2020, Plaintiff presented to the TMC Bonham Hospital Emergency Department, complaining of leg pain. (*Id.* at 411.) She was prescribed gabapentin and discharged that same day; she had normal range of motion, normal gait, no distress, and no tenderness or joint swelling. (*Id.* at 413, 416.)

On June 10, 2020, Plaintiff presented to Carevide Greenville for a primary care visit, complaining of chest and musculoskeletal pain. (*Id.* at 393.) Tiffany Willeford, FNP, noted that although Plaintiff's right leg pain had improved while she was taking gabapentin, she needed a venous doppler of the right leg and an arterial doppler of both legs. (*Id.* at 394.)

On August 1, 2020, Plaintiff suffered a stroke and was transported by ambulance to Hunt Regional Medical Center Emergency Department, where she was admitted to the intensive care unit and intubated until August 5, 2020. (*Id.* at 64, 560, 564.) The computed tomography (CT) scan and angiogram of her head and neck showed no significant stenosis, and the echocardiogram was normal except for a showing of mild diastolic dysfunction. (*Id.* at 564.) The magnetic resonance imaging (MRI) showed acute infarct involving bilateral thalami and occipital lobes and cerebellum, and the physical examination indicated grossly intact cranial nerves, no focal deficits, normal range of motion, and regular heart rate and rhythm with no murmurs, rubs or gallops. (*Id.* at 565, 567.) Plaintiff was assessed with acute metabolic encephalopathy, "unresponsiveness", acute respiratory failure due to inability to maintain airway, leukocytosis and hypothermia. (*Id.* at 560.) She suffered "multiple neurological deficits", including confusion and visual impairment, and was referred to a neuropsychologist for assessment of her neurocognitive functioning and reactive issues. (*Id.* at 565, 569.)

Days later, on August 11, 2020, Plaintiff submitted to a neuropsychological evaluation,

which indicated that she had disorientation, poor insight, and impaired attention, memory and judgment. (*Id.* at 563-64, 567-68.) Brandi Buchanan, Ph.D., opined that Plaintiff appeared to have suffered "significantly" from the stroke and had "continued and active encephalopathy exacerbating it[]s effects on her cognitive functioning". (*Id.* at 567.)

Later that month, on August 31, 2020, Plaintiff submitted to a second neuropsychological evaluation, which showed she had decreased restlessness, improved receptive and expressive communication, and the ability to organize and express her "complete" thoughts better than at the first evaluation. (*Id.* at 591-92.)

For four months, beginning September 3, 2020, Plaintiff received care and treatment at a nursing home, Windsor Healthcare Residence (Nursing Home). (*Id.* at 442.) Her admission assessment, signed by Donna Baggs, LVN, indicated Plaintiff had balance problems, decreased muscular coordination, and needed supervision to bathe and use the toilet, but she reported no pain, was able to ambulate and dress without staff assistance, and had not had any falls in the prior three months. (*Id.* at 475, 482, 484.)

On September 16, 2020, Nursing Home Director of Nursing Pamela Harold, indicated Plaintiff needed only "set up help" to eat, dress, and walk in her room, the corridor and off the unit. (*Id.* at 521, 557.) Although Plaintiff was not steady, she had intact range of motion in the upper and lower extremities and was able to stabilize herself without staff assistance to move from a seated to standing position, to walk, to turn around, to move on and off the toilet, and to perform surface-to-surface transfers. (*Id.* at 522.) She had an irritable mood and frequent mood swings, but was cooperative, alert, oriented, and in no acute distress. (*Id.* at 436.) Both Plaintiff and direct care staff believed she was capable of "increased independence in at least some [activities of daily living]". (*Id.* at 522.)

On September 24, 2020, LVN Baggs signed a "weekly-nursing summary" note, indicating Plaintiff had no problems with short term memory and possessed independent cognitive skills for daily decision-making throughout the day. (*Id.* at 491.) It also indicated Plaintiff was able to express both verbal and non-verbal ideas and wants, had an adequate ability to hear and see, and exhibited no physical or other behavioral symptoms towards self or others. (*Id.* at 492-93.)

On November 2, 2020, Barbara Dodson, FNP, opined Plaintiff was alert, oriented, and not in distress, and had normal range of motion and strength and no tenderness or swelling. (*Id.* at 595-96.)

C. **January 4, 2021 Hearing**

On January 4, 2021, Plaintiff and a vocational expert (VE) appeared and testified at a hearing before the ALJ. (*Id.* at 48-80.) Plaintiff was represented by an attorney. (*Id.*)

   1. *Plaintiff's Testimony*

Plaintiff testified that from 2016 to 2020, she worked all year around between 30 to 40 hours a week at Dollar Tree, but she could not remember "a whole lot" since her stroke. (*Id.* at 51-53, 56.) From 2005 to 2009, she worked in housekeeping and laundry services at Briarcliff Healthcare. (*Id.* at 53.) In laundry services, she would lift up to 10 pounds, sit for about 4 hours and stand or walk the remainder of the workday; in housekeeping, she would lift up to 20 pounds, sit for probably 2 hours, and stand or walk the remainder of the workday. (*Id.* at 54-55.)

Plaintiff testified that after she had a total right knee replacement in 2017, she completed physical therapy and was prescribed a cane, which she continued to use; her knee was worse than it was before the replacement, but she had not sought treatment because of lack of funds. (*Id.* at 57-60.) She also had a concussion, complex regional pain syndrome, and sleeping problems. (*Id.*)

Because driving scared her and she had severe anxiety, Plaintiff did not drive, had never

had a driver's license, and asked for a ride or took a taxi to get around. (*Id.* at 58-59.) Due to "things that happened" when she was a child, she had depression; she had not received counseling until she moved to Nursing Home after her stroke in August 2020. (*Id.* at 61.) Plaintiff was taking trazadone, fluoxetine, and Depakote. (*Id.* at 68.)

As a result of her stroke, she had issues with her eyesight and needed glasses because she "c[ould]n't hardly see" and her vision was "blurry". (*Id.* at 63, 65-66.) She also had cognitive problems, and although she "really c[ould]n't say" what kind of treatment she was receiving for her memory, she opined she would not be in a nursing home if she did not have memory problems. (*Id.* at 63, 66.) She testified that she was moving out of the nursing home "in one week" because "[her] time was up", and that she was moving to Texas with her boyfriend, where they would live with her brother. (*Id.* at 66.)

Before her stroke, she lived with her brother, who worked full-time, and her boyfriend, who was disabled and had cancer. (*Id.* at 69.) Besides taking care of her boyfriend[3] and working at Dollar Tree, she only watched television and did "little things around the house" to keep it clean because of her knee problems. (*Id.* at 69-70.)

On cross-examination, Plaintiff affirmed she had been assessed with cognitive communication disorder and had received treatment, which had helped "a little bit", but she still had difficulty forming her words and "getting them across". (*Id.* at 70-71.) After her stroke, she had difficulty getting along with family, friends and strangers and controlling her emotions, including anger, frustration and aggression. (*Id.* at 71.) She noticed a change in her ability to handle stress or deal with confrontation, and she "tr[ied] to avoid that". (*Id.* at 74.)

---

[3] She would help her boyfriend shower and dress; she did not receive any money for taking care of him. (doc. 19-1 at 69-70.)

Plaintiff had panic attacks every day and used to go to the hospital in the past to calm down; she had been prescribed medication for anxiety, which calmed her down two or three hours after taking it. (*Id.* at 72.) At Nursing Home, she was reminded to do things, like take her medication. (*Id.* at 72-73.)

Plaintiff confirmed that she had headaches since the stroke. (*Id.* at 73.) She could sit no more than 10 minutes at a time, and due to her knee limitations, could walk or stand no more than 15 minutes at a time. (*Id.*)

2. *VE's Testimony*

The VE testified that Plaintiff's past work was a "combination" of hospital cleaner (DOT 323.687.010, SVP-2, customarily medium)[4] and laundry laborer (DOT 361.687-018, SVP-2, customarily medium), the latter of which Plaintiff said she performed at the light level. (*Id.* at 76.)

The VE considered a first hypothetical individual with the same age, education, and past work experience as Plaintiff, who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk "six hours each per eight-hour day"; never push or pull with the right lower extremity; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and perform simple, repetitive, routine tasks but never work at a production rate pace. (*Id.*) The individual could not perform Plaintiff's past work but could perform other jobs in the national economy, such as "bakery worker conveyor line" (DOT 524.687-022, SVP-2, light, CED-111[5]) with 230,000 jobs nationally; cleaner housekeeper[6] (DOT 323.687-014, SVP-2, light, CED-111) with 900,000 jobs nationally; and produce weigher (DOT

---

[4] DOT stands for Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

[5] Although the VE appeared to note that "CED of 111" entailed "very simple routine work", she offered no other explanation. (doc. 19-1 at 77.)

[6] This job entailed light dusting and emptying the trash. (doc. 19-1 at 77.)

7

299.587-010, SVP-2, light CED-111) with 50,000 jobs nationally. (*Id.* at 76-77.)

The ALJ modified the hypothetical to include off-task breaks more than 15 percent of the workday. (*Id.* at 78.) The VE testified there were no jobs in the national economy such an individual could perform because based on studies and census data from the Department of Labor, employers would tolerate off-task breaks only up to 15 percent of the workday. (*Id.*) The VE confirmed that her testimony was consistent with the DOT and the SCO because the off-task information came from the Department of Labor. (*Id.*)

In response to questioning by Plaintiff's attorney, the VE testified that there were no jobs in the national economy for a hypothetical individual who was "consistently" absent from work at least two days a month. (*Id.* at 78.) Based on information obtained from employers nationally and quoted by employment agencies, the extent of the average absenteeism was 1.5 days per month, which included coming in late and leaving early. (*Id.* at 78-79.)

The VE also testified that a hypothetical individual who had memory problems and needed more supervision than other employees to stay on task would be unable to do competitive work if she could not meet the off-task standard or required additional supervision, because even unskilled, simple routine work required that the individual be on task 85 percent of the workday. (*Id.* at 79.)

D. **ALJ's Findings**

The ALJ issued a decision denying benefits on January 26, 2021. (*Id.* at 32-43.) At step one, he found that Plaintiff had not engaged in substantial gainful activity "since July 26, 2019, the application date". (*Id.* at 34.) At step two, he found that Plaintiff had the severe impairments of osteoarthritis of the right knee, depression, anxiety, and stroke, and the nonsevere impairment of hypertension. (*Id.* at 34-35.) (citing (20 C.F.R. § 416.920(c)). At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). (*Id.* at 35.) The ALJ specifically considered Listings 1.02, 11.04 and 12.04. (*Id.*)

Next, the ALJ determined that Plaintiff had the physical RFC to perform light work as defined in 20 C.F.R. § 416.967(b), limited to occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, but never climb ladders, ropes or scaffolds, and never push and/or pull with the right lower extremities, and the mental RFC to perform simple, routine, repetitive tasks but never work at production rate pace. (*Id.* at 37.) At step four, the ALJ determined that Plaintiff was unable to perform her past work. (*Id.* at 41.) At step five, he found that transferability of job skills was not material to the determination of disability because her "past relevant work [was] unskilled", but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, "since July 26, 2019, the date the application was filed." (*Id.* at 43.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.   ISSUES FOR REVIEW

Plaintiff presents a single issue: "The ALJ's RFC is not supported by substantial evidence because the ALJ had no medical guidance and therefore further record development was needed". (doc. 24 at 4, 9.)

**A.   *Ripley* Error**

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though

there was no medical testimony to support that conclusion. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Ripley*, 67 F.3d at 552. Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so it found that the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp. 2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

Here, the ALJ considered Plaintiff's unilateral right knee replacement due to osteoarthritis of the right knee, and her allegations that she had problems standing and walking and used a cane to ambulate. (doc. 19-1 at 37-38 (citing *id.* at 57-60, 69, 73.)) He noted that between March 2020 and June 2020, she complained of right leg pain, which improved while taking gabapentin. (*Id.* (citing *id.* at 393-94, 413, 419, 421.)) The ALJ also considered that a stroke in August 2020 left Plaintiff with "residual" problems with her vision and ability to balance, remember, think, communicate, and control her emotions, and that she had received care and treatment at a nursing home for about four months. (*Id.* at 36-38 (citing *id.* at 63-66, 70-71, 74-75, 484, 572.)) He also

considered the findings in her medical records, which showed that she had acute infarct involving bilateral thalami and occipital lobes and cerebellum, but no significant stenosis, and a normal echocardiogram, except for a showing of mild diastolic dysfunction. (*Id.* at 38 (citing *id.* at 565, 567, 569, 572.)) He considered the findings in the nursing home assessment, which indicated that she had intact range of motion in the upper and lower extremities and did not need staff assistance to move to and from various positions. (*Id.* at 40 (citing *id.* at 451-53.)) The ALJ also considered Plaintiff's first neuropsychological evaluation after her stroke, which indicated that she had poor insight, disorientation, and impaired attention, memory and judgment, as well as her second evaluation, just weeks later, which indicated decreased restlessness, improved receptive and expressive communication, and improved ability to organize and express her thoughts. (*Id.* at 38-39 (citing *id.* at 567-68, 591-92.)) He noted that Plaintiff's physical examinations "generally" indicated she had regular heart rate and rhythm without murmurs, rubs, or gallops, normal range of motion normal gait, and no tenderness or joint swelling, and that her mental examinations "typically" indicated she was alert, oriented, in no acute distress, and cooperative despite an irritable and anxious mood. (*Id.* at 38-40 (*see id.* at 283, 314, 349, 353, 363, 421, 436, 461, 470, 565, 597.)) The ALJ specifically noted that the SAMCs and the SAPCs had found that there was insufficient evidence to make a medical determination as to Plaintiff's physical and mental limitations. (*Id.* at 41 (citing *id.* at 81-87, 89-96.))

Although the ALJ gave "careful consideration of the evidence", there are no medical opinions in the record regarding the effects that Plaintiff's physical or mental impairments had on her ability to work. (*Id.* at 32-43, 265-599.) The ALJ did not explain how he determined that Plaintiff was able to perform light work, limited to occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, but never climb ladders, ropes or scaffolds or push and/or pull

13

with the right lower extremities, and could perform simple, routine, repetitive tasks, but never work at production rate pace. (*Id.* at 37.) He therefore appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not—without the opinions from medical experts—derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ—a layperson—may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to

claimant's mental impairments).

B. **Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, she must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting the disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Contrary to the Commissioner's contentions, the ALJ's failure to rely on a medical opinion regarding Plaintiff's physical and mental RFC casts doubts as to whether substantial evidence exists to support the finding that she is not disabled. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also Thornhill v. Colvin*, No. 3:14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Jan. 16, 2015), at *11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medical opinion

in determining the plaintiff's RFC). Accordingly, the error is not harmless, and remand is required on this issue.

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED** on this 5th day of July, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE